**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

*FILED*

FEB 04 2011

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| STEPHANE DION and<br>91934885 QUEBEC INC., d/b/a<br>DION DESIGNS,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALLWIN POWERSPORTS<br>CORPORATION, INC., ARTHUR<br>LIAO, MHR HELMET CO. LTD.,<br>FOSHAN SHUNDE FENGXING<br>HELMETS LTD., and JIANGMEN<br>PENGCHENG HELMETS LTD.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

1:11-cv-0173 RLY-TAB

Cause No._____

**JURY DEMAND**

## VERIFIED COMPLAINT AND JURY DEMAND

1.      This action arises from the misuse of the intellectual property of Stephane

Dion and 91934885 Quebec Inc., d/b/a Dion Designs ("Mr. Dion" and "Dion Designs"

individually, and "Dion" collectively), by Allwin Powersports Corporation, Inc. ("Allwin"),

its principal Arthur Liao ("Mr. Liao"), and affiliated Chinese manufacturers owned by

Mr. Liao (collectively "MHR").  Allwin, acting as North American distributor for MHR,

seeks to introduce into the United States marketplace a new line of motorcycle helmets that

was originally designed by Dion under the terms of a royalty-bearing agreement.  Since

mid-2010, however, Mr. Liao and MHR have refused to honor the royalty obligations for

the use of Dion's designs.  Specifically, Dion has received no compensation at all for new

designs which were submitted to Mr. Liao in March 2010, only weeks before Mr. Liao

terminated his business relationship with Dion and about a month after Allwin was

incorporated to serve as the distributor for MHR's own brand of helmets. On February 18-20, 2011, Indianapolis will host the "2011 Dealer Expo", the major annual trade show for North American dealers of motorcycles and motorcycle accessories. At that show, Allwin is expected to introduce to the United States market a new line of helmets branded "LS2," which will cause significant and irreparable harm by depriving Dion of the rightful use of the intellectual property incorporated in those products and thereby misappropriating the market opportunities for the designs created by Dion.

## PARTIES, JURISDICTION AND VENUE

2.      Stephane Dion is a Canadian national, whose domicile and place of residence is 1458 10em Rang Ouest, Granby J2J 0P7, Quebec, Canada.

3.      91934885 Quebec Inc., d/b/a Dion Designs is a foreign corporation organized and existing pursuant to the laws of the Province of Quebec, Canada, having its principal place of business in Granby, Quebec.

4.      On information and belief, Allwin is a corporation organized under the laws of the State of Illinois, having its principal place of business at 2225 White Oak Circle, Aurora, Illinois, 60502-9670. On information and belief, Allwin is primarily or exclusively owned, directly or indirectly, by Mr. Liao.

5.      On information and belief, Allwin has done, is doing, and will continue doing business in the State of Indiana, and, for the purposes of jurisdiction and venue, resides in the Southern District of Indiana. In particular, Allwin maintains a website with the domain name "ls2helmets.us," the home page of which states that "One of the world's largest manufacturers" (a reference to MHR) "is coming out of its shell" at the "Dealer Expo 2011" in Indianapolis.

2

6.      On information and belief, Mr. Liao is a Chinese national residing in China, having a business address at Jiangmen Pengcheng Helmets Ltd., Seventh No. 01, Dongsheng Road, Gonghe Town, Heshan City, Guangdong Province, China.  On information and belief, Mr. Liao is alternatively referred to as "Haotian" Liao and, for purposes of dealings with Europeans and North Americans, "Arthur" Liao.

7.      On information and belief, MHR Helmet Co. Ltd. is a corporation organized under the laws of China, having a principal place of business at Seventh No. 01, Dongsheng Road, Gonghe Town, Heshan City, Guangdong Province, China.  According to the Allwin website, MHR Helmet Co. Ltd. was established in 1998 under a business previously founded by Mr. Liao, Xiqing Plastics.  Xiqing Plastics had been manufacturing motorcycle helmets for the domestic market in China since around 1991, and MHR Helmet Co. Ltd. was then created for the purpose of producing and exporting motorcycle helmets across the world.

8.      On information and belief, Foshan Shunde FengXing Helmets Ltd. is a corporation organized under the laws of China, having its principal place of business at 7 Jianshe Road, Xiqing Industrial Zone, Longjiang, Shunde, Foshan, Guangdong, China.  On information and belief, Foshan Shunde FengXing Helmets Ltd. is owned primarily or exclusively, directly or indirectly, by Mr. Liao, and operates the initial factory where MHR helmets have been manufactured since the establishment of MHR Helmet Co. Ltd.

9.      On information and belief, Jiangmen Pengcheng Helmets Ltd. is a corporation organized under the laws of China, having its principal place of business at Seventh No. 01, Dongsheng Road, Gonghe Town, Heshan City, Guangdong Province, China.  According to the Allwin website, Jiangmen Pengcheng Helmets Ltd. was

3

established jointly by Mr. Liao and his brother in 2005, and is a more expansive factory in which MHR helmets have been manufactured since 2005.

10. On information and belief, MHR Helmet Co. Ltd., Foshan Shunde FengXing Helmets Ltd. and Jiangmen Pengcheng Helmets Ltd. have common majority ownership and are commonly controlled by Mr. Liao, and accordingly will be referred to jointly as "MHR." On information and belief, MHR has done, is doing, and will continue to do business in the State of Indiana, both through the importation, sales, marketing and promotion of MHR-produced helmets by Allwin as well as by the importation, sales, marketing and promotion of additional helmets manufactured by MHR for other helmet businesses active in the United States and specifically the Indiana market.

11. This action raises claims arising under federal law, including 15 U.S.C. §1125, 17 U.S.C. §501, 28 U.S.C. §2201 and Fed. R. Civ. P. 57. The declaratory relief being sought relates to the rights and interests of the parties in the designs for the helmets at issue.

12. This action also raises state law claims for misappropriation of trade secrets, breach of contract, conversion, and unfair competition.

13. This Court has jurisdiction over the subject matter of this action and over the parties pursuant to 28 U.S.C. §§1331, 1332(a)(2), 1338 and 1367.

14. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)-(d).

## FACTS RELEVANT TO ALL COUNTS

15. For the last twenty-five years, Mr. Dion has been the successful designer of a wide array of motorcycle safety accessories. For many years, through Dion Designs, he has

designed a variety of such accessories, including body armor, motorcycle attachments, and in particular motorcycle helmets. These designs have been marketed to a number of manufacturers that have subsequently sold products utilizing those designs to distributors, dealers, and retailers in Asia, Europe, and North America. Dion has established a worldwide reputation as a skilled designer of motorcycle helmets.

16.     The proper design of a motorcycle helmet is a complex and time consuming process, requiring both technical and artistic skill. In order to retain their position within the commercial marketplace, retailers of motorcycle helmets place a premium on obtaining a flow of new and innovative designs that are not only functional and safe, but also aesthetically pleasing and stylish to consumers. Successful helmet designs can have a "shelf life" on the order of four to eight years, and a quality helmet can retail for hundreds of dollars each.

17.     As part of a marketing strategy, many helmet retailers produce marketing material that deliberately associates a particular helmet model with its designer.

18.     In August 2005, Dion Design entered into a contract with Foshan Shunde Fengxing Helmets, Ltd. A true and accurate copy of that contract is attached herewith, and incorporated herein, as Exhibit A. That contract was signed by Mr. Dion and Mr. Liao.

19.     Pursuant to the terms of the contract, MHR agreed to purchase "all the designs of helmets and helmet accessories" from Dion Design and to pay a commission of $0.50 for "each helmet which is produced with [Dion Design's] deisng [sic]."

20.     Dion Design agreed to furnish designs exclusively for MHR for a period of four years from the date the agreement was signed. The contract contemplated that Dion

Design would produce "new helmet designs" in time to present products at "the Indy show" in February 2006.

21.     According to the Allwin website, MHR is "one of the largest producers of motorcycle helmets in the world." MHR has historically served to a large extent as an original equipment manufacturer ("OEM") for a number of other companies that independently label and retail the helmets under their own brand names throughout the world, including the United States. Beginning around 2006, MHR has also branded its own line of helmets under the names "LS2" and "Nuvo" for sale outside of China, in particular in Europe. Designs created by Dion have been incorporated in MHR products both in its capacity as an OEM and for its own LS2 and Nuvo product lines.

22.     Between August 2005 and April 2010, Dion Design created numerous helmet designs and provided them to MHR, approximately seventeen of which have been the basis for helmets placed into production by MHR and have been sold in Asia, Europe, and North America – including the United States. In addition, MHR also holds a number of helmet designs created by Dion Designs that, on information and belief, have not been commercialized to date.

23.     Dion Design operates out of a location in Quebec, Canada, where Mr. Dion at all relevant times has maintained both a studio and a workshop. The design process involves a number of stages, progressing from the creation of initial drawings to fabrication of a prototype, then 3D imaging, followed ultimately by the development of specifications, creation of molds and other preparations for manufacture of commercial products. Mr. Dion has handled all aspects of that process. Especially during the early phase of the business dealings, he divided time between Quebec and China, where, on top of creating

designs, he assisted MHR in getting arrangements in place for fabrication and manufacture of quality helmet products. Over the course of the business relationship, he also provided assistance to MHR in communications and interactions with customers for which MHR was producing helmets incorporating Mr. Dion's designs. Throughout the course of dealings, the design creation occurred predominantly at the Dion Design location in Quebec, at Mr. Dion's studio and workshop, utilizing materials and equipment of his own selection, without design direction or oversight from Mr. Liao or other MHR supervisors.

24.    During the time period from August 2005 to April 2010, Dion was paid the agreed upon royalty of $0.50 per helmet produced utilizing the provided designs.

25.    In addition to the commissions for MHR helmets based on designs created by Dion, around 2006 Mr. Dion began receiving, by oral agreement with Mr. Liao, additional monthly payments as compensation for work provided to MHR beyond the creation and provision of designs, in particular involving customer relations and education and training of MHR's technical staff. The monthly fee also provided compensation for discrete design elements created by Dion such as chin bars that were utilized in MHR helmets not otherwise based on designs provided by Dion. For the designs provided by Dion on which MHR products were more fully based, however, Dion continued to receive commissions at the agreed rate of $0.50 per helmet.

26.    For a period of time after the conclusion of the initial four-year term contemplated under the contract, the course of dealings between the parties continued without substantial alteration. Dion continued to provide designs to MHR, Mr. Dion continued to provide additional assistance and services to MHR, and MHR continued to

7

pay $0.50 for helmets based on the designs created by Dion as well as the added monthly compensation.

27.     Following the introduction of MHR's own line of LS2 helmets in Europe, Mr. Liao discussed with Mr. Dion a plan to launch an MHR line of LS2 helmets in North America. For years, MHR had been manufacturing helmets as an OEM for sale by third party brands in the United States, many of which incorporated Mr. Dion's designs, but Mr. Liao expressed an intent to enter the market in the United States and Canada directly with a new line of LS2 helmets.

28.     Over a period of several months starting in late 2009, Mr. Dion developed new designs for a line of motorcycle helmets for the planned LS2 line in North America. The design work was done by Mr. Dion in his workshop and studio in Quebec, using his own materials and equipment of his own selection, without oversight or supervision by Mr. Liao or other MHR representative. He created a set of designs for two new helmet models, incorporating two distinctive shells, as well as new designs for the ratchet and shield retention systems.

29.     Over a period of time ending in March 2010, consistent with the terms of the August 2005 contract and the established course of dealings, Dion delivered the new designs to Mr. Liao and MHR. The design materials delivered to MHR included technical drawings, 3-D rendered images, and a physical "mock-up" to serve as a basis for the production process. Dion created two basic designs, one for a helmet intended to be a high end model and the other a more economical model. True and accurate copies of drawings of the two sets of new designs created by Dion and photographs of prototypes are attached herewith, and incorporated herein, as Exhibits B and C.

8

30. The new helmet designs were visually distinctive, incorporating aesthetic design elements such as unique mouth shields, visor ratchets with original and visually recognizable shape and lines, and a pattern of channels and ridges along the sides, top and rear of the helmets. In addition, the designs incorporated unique and distinctive technical features, including air vents and ratchet system used to adjust the visor. The new designs represented an innovative platform for an original line of helmets, as opposed to a modification to an existing product design.

31. Shortly after the new helmet designs were delivered to MHR, Mr. Liao indicated to Mr. Dion that he did not wish to continue the business relationship. Dion, accordingly, ceased doing further design work for MHR in mid-April 2010.

32. For a period of several months following the termination of the business relationship, Mr. Liao recognized and acknowledged MHR's continuing obligation to provide commissions for products utilizing designs created and provided by Dion, but he sought to renegotiate the terms and royalty rate. Mr. Dion did not agree to Mr. Liao's proposals.

33. The last payment by MHR to Dion was made in April 2010. Since that time, MHR has continued to produce and sell helmets incorporating designs created and provided by Dion, but Mr. Liao has refused to pay any commissions for those products. The helmets for which commissions have not been paid have been sold worldwide, including helmets branded by third party vendors, imported from China, and sold in the United States, including Indiana.

34. In or around February 2010, Allwin was incorporated in the State of Illinois. On information and belief, Allwin is primarily or exclusively owned, directly or indirectly,

9

and is controlled by Mr. Liao. According to its website, Allwin reached a "franchise agreement" with MHR to "distribute LS2 helmets in North America." Allwin's website further states that LS2 helmets are "Designed in Europe, Created in China, Distributed in North America by Allwin Powersports Corp." On information and belief, Allwin is the United States corporation through which Mr. Liao seeks to implement his plan to introduce a line of MHR-produced helmets in the North America market under the LS2 brand.

35.     Allwin has actively commenced preparations for entering the North America market with a new line of LS2 helmets. Allwin has launched a website, under the domain name "ls2helmets.us," soliciting the registration of dealers to carry its "new helmets" and offering a free helmet to the first 500 dealers to register on the website. The Allwin website does not provide any retail pricing and is not directed to conducting transactions with individual customers, and instead is directed to soliciting dealers to carry the new products. Allwin's homepage features a visual image of an LS2 helmet that is partially obscured and emerging from an egg, with the slogan "One of the World's Largest Manufacturers Is Coming Out of Its Shell." The homepage encourages dealers to visit Allwin's booth at "Dealer Expo 2011" to be held in Indianapolis on February 18-20th. A true and accurate copy of Allwin's homepage and the "About Us" portion of its website is attached herewith, and incorporated herein, as Exhibit D.

36.     The Allwin website shows two products as being available, each identified as model "FF385" and differing from each other only in paint schemes. True and accurate copies of the product page and associated views and details for each helmet are attached herewith, and incorporated herein, as Exhibit E. On information and belief, Allwin further plans to import, market, distribute and sell additional LS2 products in the United States,

10

specifically including LS2 helmets recently introduced in Europe as models "FF358," "FF386," "OF560" and "OF569." The "FF" series indicates full face models, while "OF" indicates open face models.

37.     The design of the FF385 helmets featured on the Allwin website is in all essential respects identical to one set of new designs created by Dion and delivered to MHR and Mr. Liao in March 2010. Specifically, the structure and appearance of the FF385 model is the same as the high end helmet design created by Dion, as shown in Exhibit B. A similar line of helmets, also designated FF385 under the LS2 brand, was recently introduced in Europe in late 2010, but has not previously been marketed in the United States.

38.     The FF358 model recently introduced under the LS2 brand in Europe, similarly, is in all respects identical to the other set of designs created by Dion and delivered to MHR by early 2010. That model, too, has not yet been marketed in the United States, but on information and belief is planned to be part of the LS2 product line offered by Allwin. The relevant page from the 2011 LS2 Europe catalog, showing the FF358 as a "New" product, is attached hereto, and incorporated herein, as Exhibit F. The structure and appearance of the FF358 helmet is the same as the new design for the more economical product created by Dion, as shown in Exhibit C.

39.     Three other LS2 models recently introduced in Europe, designated as FF386, OF560 and OF569, utilize key elements of the new shield retention system designs created by Dion and delivered to MHR by early 2010. Those models have not yet been marketed in the United States, but on information and belief will be part of the LS2 line offered by Allwin. The shield retention system and associated visor ratchet mechanism include both

11

aesthetic and functional designs, serving not only to control the placement and position of the visor, but also to serve as an identifying line and design feature in the helmet's overall appearance. Relevant pages from the 2011 LS2 Europe catalog, showing the FF386, OF560 and OF569 models as "New," are attached hereto, and incorporated herein, as Exhibit G.

40.     The Dealer Expo in Indianapolis is an annual trade show for dealers in motorcycles and related accessories, including motorcycle helmets. It is the only annual trade show held for motorcycle dealers in the United States, and serves as a platform at which OEMs and other vendors introduce new products and promote distribution and sale to the public through the dealer attendees. It is a major event of great significance in the motorcycle accessories business in the United States.

41.     On information and belief, and as asserted on its website, Allwin intends to introduce the FF385 model at Dealer Expo 2011 in Indianapolis on February 18 through 20, 2011. The launch of the LS2 product line, and specifically the FF385 design, at the 2011 Dealer Expo in Indianapolis represents MHR's entry to the United States market as a direct supplier of its own brand of helmets. On information and belief, Allwin plans to market additional LS2 products that have not previously been introduced in the United States market, based in whole or in material part on designs provided by Dion, including specifically the new models recently introduced in Europe as FF358, FF386, OF560 and OF569.

42.     Dion has not authorized the use of the designs incorporated in the FF385 products by Allwin, MHR or Mr. Liao, nor the designs incorporated in the FF358 model, nor the use of the shield retention system designs in the FF386, OF560 or OF369 models,

12

and has not authorized the production, importation, marketing or sale of any such helmets by Allwin, MHR or Mr. Liao.

43. Dion has not received, or been offered, any royalties, commissions or other compensation for the use of the designs incorporated in the FF385, FF358, FF386, OF360 or OF369 products by Allwin, MHR or Mr. Liao. All of those products were introduced in Europe for the first time in late 2010, after MHR and Mr. Liao had already repudiated the arrangement with Dion and had announced their refusal to pay any further royalties, commissions or compensation for the use of designs provided by Dion, and all have yet to be launched in the United States. As a result, Dion has received no compensation whatsoever for those designs.

44. After Mr. Liao and MHR repudiated the arrangement with Dion and refused to pay any further commissions, royalties or compensation for the use of Dion's designs, Dion was prepared to utilize the new designs in support of another business venture, and anticipated entering into an agreement with one or more other helmet producers to commercialize those designs. As a result of MHR's recent introduction of the new LS2 models in Europe, followed by Allwin's announced intention to launch a corresponding LS2 line in the United States, however, Dion's plans to make commercial use of those designs have been placed on hold.

45. Dion has taken steps to protect the proprietary rights in the designs shown in Exhibits B and C. Dion has submitted two applications for design patents, one relating to the helmet design shown in Exhibit B and the other more specifically the side view showing the design of the shield retention system, and those applications are now pending before the United States Patent and Trademark Office. In addition, Dion has submitted applications

13

to the United States Copyright Office for registration and copyright protection of the original design features of the helmets shown in both Exhibit B and Exhibit C, including specifically the design of the shield retention system, and those applications are currently pending.

## Count I:  Violation of Lanham Act §43(a)

46.    Dion repeats and incorporates by reference the averments set forth in ¶¶ 1-45, inclusive.

47.    Allwin has publicized false and misleading statements and misrepresentations, and false designations of origin, in connection with its introduction of the LS2 line of helmets, in violation of Lanham Act §43(a), 15 U.S.C. §1125(a).

48.    The false and misleading statements and misrepresentations include, without limitation, false statements as to the source and origin of the products, misleading representations as to rights and interests in the designs, and misleading representations concerning Allwin's authority to import and sell such products, without disclosing the absence of valid license or agreement with the designer.

49.    These false and misleading statements and misrepresentations are likely to deceive third parties and cause confusion and mistake within the marketplace for motorcycle helmets.  In particular, dealers and other industry participants attending the 2011 Dealer Expo in Indianapolis are likely to misunderstand, based on Allwin's promotional efforts, that defendants have acquired valid rights in the new designs and are authorized to import, market and sell products incorporating those designs, when in fact the designs were acquired from Dion under a commission-based license that was promptly

repudiated without payment to Dion of any royalties, commissions or other compensation for the new designs.

50.     Allwin, MHR and Mr. Liao have publicized false designations as to source and origin, false and misleading descriptions of fact, and false and misleading representations of fact, in violation of Lanham Act §43(a), 15 U.S.C. §1125(a).  For example, Allwin's website has falsely promoted its products as having been "designed in Europe," when in fact the designs were created at the Dion workshop and studio in Quebec.  To those knowledgeable in the industry, the designation "designed in Europe" suggests the designs were developed at MHR's "tech design team" facility in Barcelona, Spain, thereby falsely suggesting the designs are proprietary to MHR.

51.     Dion has suffered, and in the absence of relief is likely to continue to suffer, damages and irreparable harm as a result of defendants' false designations of origin and false and misleading statements and misrepresentations.

52.     Pursuant to 15 U.S.C. §1125(b), Dion is entitled to a ban on the importation of LS2 helmets incorporating designs created by Dion.

53.     Pursuant to 15 U.S.C. §§1125(a), 1116 and 1117, Dion is further entitled to an award of compensatory and exemplary damages, injunctive relief and recovery of legal costs and attorney fees.

### Count II:  Copyright Infringement

54.     Dion repeats and incorporates by reference the averments set forth in ¶¶1-53, inclusive.

55.     Canada is a signatory to the Berne Convention and Mr. Dion is a Canadian citizen. Dion, accordingly, is entitled to copyright protection under United States law.

56.     The design and appearance of the helmets now incorporated in defendants' FF385 and FF358 products, and the design of the shield retention systems in defendants' FF386, OF560 and OF569 products, are unique and original works created by Dion, having distinctive appearances and aesthetic merit.

57.     Dion is the author and has retained all rights arising under the copyright laws in the designs and artwork comprising the helmets now embodied in those products.

58.     The designs in question, as reflected in the drawings and photographs included in Exhibits B and C hereto, were independently created by Dion in anticipation of a license arrangement under which Dion would receive specified compensation. That arrangement, however, was repudiated by defendants shortly after delivery of the design materials by Dion. As a result, Dion has received no royalties, commissions or other compensation for those designs. By repudiation, violation of material terms and failure to provide the agreed consideration, defendants forfeited any license in the designs provided by Dion.

59.     Dion has duly filed for registration of the designs with the United States Copyright Office, in accordance with applicable law. When and as the registration process is completed and certificates of registration have been duly issued, Dion will seek to amend this Complaint to include such an averment.

60.     The LS2 products that defendants seek to introduce at the 2011 Dealer Expo in Indianapolis are substantially similar, and in all relevant respects are identical, to the designs created by Dion. On information and belief, the FF385 products were deliberately

copied and manufactured based on the design materials provided by Dion. Similarly, the FF358 products were deliberately copied and manufactured based on design materials provided by Dion, and the shield retention systems for the FF386, OF560 and OF569 products were deliberately copied and based on designs created by Dion.

61.　Defendants have acted and, absent relief, will continue to act in violation of Dion's rights under the copyright laws.

62.　Dion has suffered and, in the absence of relief, will continue to suffer irreparable harm and damages as a result of defendants' commercialization of his designs, without license, authorization or tender of compensation.

63.　Subject to completion of the registration process, Dion is entitled to relief under 17 U.S.C. §§501 through 505, including an award of compensatory and exemplary damages, injunctive relief, impoundment of the infringing products, and recovery of legal costs and attorney fees. In accordance with 17 U.S.C. §§601 through 603, Dion is entitled to a ban on importation of infringing products by defendants.

### Count III:  Misappropriation of Trade Secrets

64.　Dion repeats and incorporates by reference the averments as set forth in ¶¶1-63, inclusive.

65.　The designs created by Dion that have been incorporated by defendants into the LS2 line of helmets are unique and proprietary, have substantial commercial value, and constitute trade secrets.

66.     Dion took reasonable efforts to protect the confidentiality of the designs, making disclosure only under an agreed arrangement with defendants that was then repudiated and terminated without provision of the expected consideration or any compensation.

67.     Defendants obtained Dion's trade secrets pursuant to a license and agreement that is no longer valid or in effect. By then proceeding to incorporate those designs in commercial products now being introduced in the United States market, defendants have misappropriated the trade secrets without authorization of Dion.

68.     The trade secrets misappropriated by defendants derive substantial commercial value from not being generally known in the United States market, representing innovative new designs for a new line of helmets being launched by defendants at the 2011 Dealer Expo in Indianapolis.

69.     As a result of defendants' unlawful use of Dion's trade secrets, Dion has been deprived of the opportunity to commercialize, sell or otherwise market products reflecting the trade secrets within the marketplace. The value of the designs has been and, once they have been introduced to the relevant market at the 2011 Dealer Expo, will be substantially reduced, as a result of becoming publicly promoted and commercialized in the United States.

70.     Upon information and belief, defendants have acted willfully, maliciously and without right or justification.

71.     As a direct and proximate consequence of defendants' unlawful misappropriation of trade secrets, Dion is entitled to recover actual damages, monies for

18

unjust enrichment, alternatively a reasonable royalty, exemplary damages, and reasonable attorney fees.

## Count IV:  Breach of Contract

72.     Dion repeats and incorporates by reference the averments as set forth in ¶¶1-71, inclusive.

73.     Dion provided design materials to MHR and Mr. Liao in and before March 2010 pursuant to an arrangement under which commissions were to be paid for products based on those designs.  The arrangement was set forth in a written contract signed by Mr. Liao and Mr. Dion in August 2005, a copy of which is attached hereto as Exhibit A, and was continued with modifications through the course of dealings between the parties from August 2005 to April 2010.

74.     A set of designs were created by Dion with the expectation that they would be used for Mr. Liao's planned business venture to introduce a new line of LS2 products directly in the United States.  Allwin was incorporated shortly before the delivery of the design materials occurred, and is the corporate entity through which Mr. Liao and MHR are now seeking to enter the United States market with their own LS2 brand of helmets, specifically products incorporating the designs created by Dion.

75.     Shortly after delivery of the design materials was completed in March 2010, Mr. Liao terminated the business relationship.  Although for a period of several months Mr. Liao recognized and acknowledged an ongoing obligation to pay royalties or commissions for MHR-produced helmets that utilized designs created by Dion, and sought to renegotiate the rate and terms, ultimately MHR and Mr. Liao repudiated the payment

obligation altogether. Dion has not received any commission, royalties or other compensation from defendants subsequent to a final payment in April 2010.

76.     A new helmet line based on the design materials delivered by Dion by March 2010 was subsequently produced by MHR and was introduced under the LS2 brand initially in Europe in late 2010. The LS2 products that Allwin seeks to introduce in the United States market and plans to launch at the 2011 Dealer Expo in Indianapolis on February 18th-20th are also based on the designs created by Dion. Because all of those products have been introduced and initially offered for sale subsequent to the time when MHR and Mr. Liao ceased all further commissions and payments to Dion, Dion has received no royalties, commissions or compensation, at all, for the use of those designs.

77.     In addition to the introduction of new products incorporating the designs delivered by March 2010, MHR and Mr. Liao have continued to make and sell helmets utilizing other designs previously created by Dion, and in substantial quantity such products have been imported into the United States and sold under third party brands. Subsequent to April 2010, Dion has not received royalties, commissions or other compensation for the sale and distribution of those additional products.

78.     By utilizing Dion's designs after repudiating their obligations under the agreed arrangement, and despite refusing to provide the agreed consideration and material compensation for such use, defendants have violated their contractual obligations toward Dion.

79.     Dion has suffered, and in the absence of relief will continue to suffer, substantial loss and damages as a result of defendants' breach.

## Count V: Conversion

80.    Dion repeats and incorporates by reference the averments set forth in ¶1-79, inclusive.

81.    Dion delivered design materials to MHR and Mr. Liao in early 2010 under a good faith understanding that he would be compensated for those designs pursuant to the ongoing arrangement between the parties.

82.    The design materials were Dion's property, developed by Dion at the workshop and studio in Quebec using Dion's materials and equipment, reflecting the creative and useful designs developed by Dion for a new line of helmets.

83.    Contrary to the arrangement between the parties and the understanding under which Dion entrusted the design materials to the custody of the defendants, Mr. Liao terminated the business relationship shortly after the designs were delivered and then announced that no further commissions or royalties would be paid for any of the many designs created by Dion.  As a result, Dion received no compensation whatsoever for the designs delivered around early 2010.

84.    By retaining the design materials provided by Dion, without paying anything for those designs, and then utilizing those materials in the development and construction of a new line of commercial helmet products, defendants exercised unauthorized control over Dion's property in a manner inconsistent with Dion's rights.

85.    On information and belief, defendants acted with malicious intent and deliberately sought to deprive Dion permanently of the value of the design materials provided by early 2010.

86.     Dion has been substantially damaged and has suffered economic losses as a result of defendants' conversion of Dion's property.

87.     Dion is entitled to compensatory and exemplary damages arising from the unlawful conversion, as well as an award of legal costs and attorney fees.

## Count VI:  Unfair Competition

88.     Dion repeats and incorporates by reference the averments as set forth in ¶¶1-87, inclusive.

89.     The creation of the designs that have now been incorporated into the LS2 line of helmets required the expenditure of considerable time, labor, skill, and resources on the part of Dion.

90.     A competitive marketplace for motorcycle helmets and designs exists in which Allwin, MHR, Mr. Liao and Dion are participants.

91.     Dion provided design materials to defendants by March 2010 pursuant to a license arrangement that was then repudiated and terminated in April 2010, without payment of any of the agreed royalties, commissions or other compensation for those new designs.  Dion has retained all right, title and interest in those designs.  Defendants are not acting now under any valid license or agreement authorizing their use of those designs.

92.     Defendants have used, and seek to continue using, Dion's confidential and proprietary designs and information, without the consent or authorization of Dion, and without compensation to Dion.

93.     Dion is entitled to produce commercial helmets incorporating the designs that were delivered to defendants in March 2010, or to do so by entering into business

22

arrangements with other manufacturers or producers.  Those designs have substantial commercial value.

94.    Defendants have used false and misleading representations of fact, including misleading representations as to the authorization and right to market the designs utilized in the LS2 products and misrepresentations regarding the source and origin of the designs, to gain an unfair competitive advantage in the marketplace, and to deprive Dion of the lawful use of the intellectual property.

95.    The misappropriation by defendants of Dion's designs and utilization of those designs in the LS2 line of helmets constitutes a usurpation of Dion's lawful right to the intellectual property and the fruits of Dion's labor and imagination, and has caused, and will continue to cause, economic and other losses to Dion.

### Count VII:  Declaratory Relief

96.    Dion repeats and incorporates by reverence the averments as set forth in ¶¶1-95, inclusive.

97.    Dion has been deprived of intellectual property rights with respect to the designs now incorporated in the LS2 line of helmets, as a result of unlawful and deceptive practices by the defendants.  There is, at the present time, an ongoing controversy, or at very least the ripening seeds of a controversy, between the parties concerning their respective rights and interests in those designs.

98.    Declaratory relief would resolve the actual and impending disputes as to the rights, status and obligations of the parties, would quiet and stabilize their relations, and would otherwise assist in resolving the controversy between the parties.

99.     Dion is entitled to compete openly and vigorously with defendants in the design, production and distribution of motorcycle helmets, directly or through business arrangements with others, and is entitled to take all necessary and appropriate steps to protect Dion's rights in the designs. Declaratory relief would resolve any uncertainty and dispel any conflicting claims by defendants, and thereby would permit the parties to compete fairly and effectively in the marketplace. The public interest will be served by permitting such competition to occur, free of any further misappropriation and unlawful conduct by defendants, and without ambiguity regarding the rights and interests of the parties with respect to the designs.

100.    Pursuant to 28 U.S.C. §2201 and Fed. R. Civ. P. 57, Dion is entitled to declaratory relief establishing Dion's full right, title, interest and ownership of the designs, and further establishing the absence of defendants' license, authorization or any other right to utilize, exploit and commercialize the designs in the marketplace.

WHEREFORE, Dion respectfully prays that the Court enter judgment granting relief on all counts, award compensatory and exemplary damages, provide preliminary and permanent injunctive relief, enter an order impounding the infringing products and barring further importation, award legal costs including reasonable attorney fees and litigation expenses, grant declaratory relief as sought, and provide such additional relief as may be appropriate.

By their attorneys,

LEWIS & KAPPES

By _____

Todd A. Richardson (16620-49)

Counsel for Stephane Dion and Dion Designs

24

## **Verification**

The undersigned hereby verifies under the penalties of perjury that the foregoing factual representations are true and correct, that statements made on information and belief are correct to the best of my knowledge and belief, and that all exhibits are true and correct copies of the materials as represented.

Stephane Dion

**JURY DEMAND**

Plaintiffs respectfully claim the right to trial by jury on all claims and issues that may be tried by a jury under applicable law.

_____
Todd A. Richardson

Counsel for Stephane Dion and Dion Designs

LEWIS & KAPPES
One American Square, Suite 2500
Indianapolis, Indiana  46282
Telephone:   (317) 639-1210
Fax:            (317) 639-4882
E-Mail:       TRichardson@Lewis-Kappes.com