IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

**FILED**

FEB 04 2011

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| **STEPHANE DION and** | ) |
| **91934885 QUEBEC INC., d/b/a** | ) |
| **DION DESIGNS,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) |
| | ) |
| **ALLWIN POWERSPORTS** | ) |
| **CORPORATION, INC., ARTHUR** | ) |
| **LIAO, MHR HELMET CO. LTD.,** | ) |
| **FOSHAN SHUNDE FENGXING** | ) |
| **HELMETS LTD., and JIANGMEN** | ) |
| **PENGCHENG HELMETS LTD.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**1 : 1 1 -cv- 0 1 7 3 RLY -TAB**
Cause No._____

**BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Stephane Dion and 91934885 Quebec Inc., d/b/a Dion Designs (collectively

"Dion"), by counsel, submit this brief in support of the Motion for Preliminary Injunction

filed herewith, in conjunction with the Verified Complaint commencing this action.  Dion

seeks a preliminary injunction prohibiting defendant Allwin Powersports Corporation, Inc.

("Allwin") from displaying, promoting or marketing certain specific models of motorcycle

helmets at a "Dealer Expo" event scheduled to occur in Indianapolis on February 18-20,

2011.  The helmets in question are being introduced to the United States market at that

event, and are based on designs that were created by Dion but misappropriated by Allwin's

affiliates in China.  The requested preliminary injunction would preserve the status quo by

preventing the new line of imported helmets from being launched in the United States,

pending final adjudication of the claims raised in this action.  Dion seeks a hearing on this motion prior to the February 18, 2011 start date of the Dealer Expo.

### A.    **Factual Background**

The facts supporting this action and the preliminary injunction being sought are set forth in the Verified Complaint being filed herewith.  The factual representations in the Verified Complaint have been verified under the penalties of perjury by Mr. Dion.[1]  The Verified Complaint also includes supporting Exhibits, and the foundation for those materials is also supported by Mr. Dion's verification.

Mr. Dion is an established designer of motorcycle safety accessories, in particular motorcycle helmets. See Verified Complaint ¶15.  He is a Canadian national, doing business out of his Quebec studio and workshop under Dion Designs, a Canadian corporation. Id. ¶¶2, 3, 15.  He has been designing motorcycle helmets for some twenty-five years, and has established an international reputation in the industry as a skilled designer. Id.

In 2005, Dion entered into an arrangement with a helmet manufacturer in China, operated through affiliated Chinese companies known collectively as "MHR," which were and are commonly owned and controlled by an individual named Arthur (or "Haotian") Liao, a Chinese national. See Verified Complaint ¶¶6-10, 18.  Mr. Dion and Mr. Liao signed an agreement by which Dion Designs agreed to provide helmet designs to MHR exclusively for a period of four years and MHR agreed to pay a commission of $0.50 in U.S. dollars for each helmet sold by MHR using designs provided by Dion. Id. ¶¶18-20 & Ex. A.

---

[1]     In order to expedite filing, service and notice to the defendants, a scanned copy of Mr. Dion's signed Verification is included in the Verified Complaint filed herewith.  The original will be filed with the Court when received.

At the time, MHR acted as an original equipment manufacturer ("OEM") producing helmets for other companies to distribute and sell worldwide under various brand names. See Verified Complaint ¶21. MHR subsequently began to market directly its own "LS2" line of helmets in Europe. Id. Through the present, MHR has not been active as a direct competitor with its own line of products in the United States. Around 2009, however, Mr. Liao discussed plans with Mr. Dion for MHR to enter the United States market through an affiliated business, and asked him to create new designs for a line of LS2 helmets for that purpose. Id. ¶27.

In late 2009 and early 2010, Dion created a set of designs at the studio and workshop in Quebec, forming the basis for two new helmets, a higher end model and a more economical version. See Verified Complaint ¶¶28-30 & Exs. B, C. The designs were original and innovative, and incorporated both aesthetic and stylistic features and well as functional and useful elements. Id. One of the distinctive components of the designs was a shield retention system with an associated visor ratchet control mechanism, which operated to adjust and control the visor position and also formed a recognizable and appealing line and shape. Id.

Dion turned over the new design materials, including drawings, 3D computer renderings, and physical prototype, to Mr. Liao and MHR by or around March 2010. See Verified Complaint ¶29. Shortly before that delivery occurred, Allwin was incorporated as an Illinois company under the direct or indirect ownership and control of Mr. Liao and MHR. Id. ¶¶4, 34. Shortly after Dion delivered the new design materials, Mr. Liao announced that the business arrangement with Dion was being terminated. Id. ¶31. For a period of several months, Mr. Liao recognized and acknowledged an ongoing obligation to

3

continue to pay commissions or royalties on helmets utilizing designs created by Dion, but attempted to renegotiate the terms and rate. Id. ¶32. Eventually, Mr. Liao announced that all further payments would be discontinued altogether, and consequently Dion did not receive any further commissions or royalties after April 2010. Id. ¶33.

At the time Mr. Liao ceased paying commissions and royalties to Dion, the new designs delivered by March 2010 had not yet been incorporated in any commercial helmet products. See Verified Complaint ¶43. As a result, Dion received no compensation whatsoever for those designs. Id. Dion did not authorize, agree or license the use of those designs by MHR or any affiliated entity. Id. ¶42.

Nevertheless, even though the agreement under which the designs were delivered had been repudiated without any payment at all being made for those designs, MHR launched a new line of LS2 products in Europe in late 2010 based on the new designs created by Dion. See Verified Complaint ¶¶36-39 & Exs. F, G. A new model designated "FF385" is in all relevant respects identical to the higher end helmet designs created by Dion and delivered in March 2010 (compare Ex. B with Ex. E), the new "FF358" model is in all relevant respects identical to the more economical designs created by Dion (compare Ex. C with Ex. F), and the new "FF386," "OF560" and "OF569" models all feature the distinctive shield retention system design included in the materials delivered by Dion in March 2010 (compare Exs. B, C with Ex. G).

Allwin is now actively engaged in preparations to enter the United States market with the LS2 line of helmets. See Verified Complaint ¶35. It has launched a website aimed at soliciting dealers to enter into distributorship agreements to carry LS2 helmets, announcing that "One of the world's largest manufacturers," i.e., MHR, "is coming out of

4

its shell." Id. ¶¶34-35 & Ex. D. The Allwin website describes its products as "designed in Europe, created in China" and distributed by Allwin. Id. The website also describes the history of MHR, its establishment by Mr. Liao, and the new Allwin venture to distribute LS2 helmets in North America. Id.

The Allwin website displays two models of helmets, both designated FF385, apparently differing only in the surface graphics. See Verified Complaint ¶36 & Ex. E. The FF385 model is in all relevant respects identical to one set of new designs created by Dion and delivered to MHR in March 2010. Id. ¶37; compare Ex. B with Ex. E. While the FF385 is apparently meant to be the flagship product for Allwin, given the new line of LS2 products recently introduced in Europe there is every reason to expect that Allwin also has the capability and intention of carrying the other LS2 helmets incorporating Dion's new designs, including specifically the FF358, FF386, OF560 and OF569 models. Id. ¶¶36-39.

Allwin plans to launch its new product line at the Dealer Expo in Indianapolis on February 18-20, 2011. See Verified Complaint ¶¶35, 41 & Ex. D. The Dealer Expo is an annual event held in Indianapolis, is the only major annual trade show for motorcycle dealers in the United States, and is an event of great significance in the industry. Id. ¶40. As announced on its website, Allwin plans to be an exhibitor at the Dealer Expo, and anticipates taking advantage of that opportunity to present its new LS2 products, in particular the FF385 model, to the dealer attendees. Id. ¶41 & Ex. D. The event marks a pivotal launching point for the new products to a national audience of dealers in a position to carry and market the new line.

5

**B.     Procedural Posture**

Dion seeks a preliminary injunction directed specifically to Allwin and the planned presentation at the Dealer Expo in Indianapolis, which is scheduled to commence on February 18, 2011. The preliminary injunction motion and this supporting brief are being filed along with the Verified Complaint. As explained in more detail in the Motion (see ¶11), actual notice of this action and copies of the filings are being provided by e-mail to all defendants on the same day as filing. In addition, Allwin will be formally served by express delivery at its primary place of business in Aurora, Illinois, on the first business day following filing. Id. ¶12.

Notably, the motion for preliminary injunction is directed to Allwin only, and not the other defendants, insofar as Allwin is the entity that has reserved a booth as an exhibitor and plans to present the new line of helmets at the Dealer Expo in Indianapolis on February 18-20, 2011. Allwin, accordingly, has been notified and formally served using the most expeditious means, and the other defendants have been provided actual notice contemporaneously. Any delay in perfecting formal service on Mr. Liao, a Chinese national, and the China-based MHR family of companies, therefore, does not erect any impediment to the prompt issuance of a preliminary injunction against Allwin prior to February 18, 2011.

**C.     Standard for Issuing a Preliminary Injunction**

Pursuant to Fed. R. Civ. P. 65(a), a preliminary injunction may be properly issued by the Court upon due notice and hearing. The traditional purpose of a preliminary injunction is to preserve the status quo, pending final disposition of the merits through a complete adjudication of the claims being presented. See American Hospital Association v.

6

Harris, 625 F.2d 1328, 1330 (7th Cir. 1980). Entry of the requested preliminary injunction would serve that function here, insofar as Allwin is a start-up company seeking to launch a new line of products that have not yet been introduced in the United States market. The relief sought here would prohibit the planned introduction of the new product line, pending full and final adjudication of the claims challenging Allwin's right to import, market and distribute those products in the United States.

A party seeking a preliminary injunction must show a reasonable likelihood of success on the merits of the underlying claims, as well as irreparable harm and inadequate remedy at law in the absence of preliminary equitable relief. See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008); Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001). For purposes of the threshold requirement, the standard for the showing on the merits is not high, and may be satisfied by evidence indicating the plaintiffs have a "better than negligible" prospect of prevailing at trial. Girl Scouts, 549 F.3d at 1096; Ty, 237 F.3d at 897. Harm is deemed "irreparable" if it cannot be prevented or fully rectified by final judgment after trial, and may include harm to unique interests such as intellectual property or damage to intangible assets such as goodwill. Girl Scouts, 549 F.3d at 1089-90; Ty, 237 F.3d at 902-03. A remedy at law, such as recovery of money damages, is considered "inadequate" if it is deficient as an alternative to injunctive relief, as when damages would be difficult to quantify or collect. Girl Scouts, 549 F.3d at 1095.

If the initial showing of likelihood of success on the merits, irreparable harm and inadequate remedy at law are properly supported, the Court then balances the relative harm the plaintiffs would suffer absent a preliminary injunction against that faced by the

enjoined party if the injunction is granted.  Girl Scouts, 549 F.3d at 1086; Ty, 237 F.3d at 895-96.  In doing so, the Court employs a "sliding scale," by which a stronger likelihood of success on the merits supports entry of a preliminary injunction with less demonstration of irreparable harm, and the less likely the party is to prevail at trial the greater the disparity in harm needs to be to support injunctive relief.  Id.  In the balancing calculation, consideration of the public interest has been described as a "wild card."  See Girl Scouts, 549 F.3d at 1086; Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1433 (7th Cir. 1986).

The determination of a preliminary injunction motion, by its nature, is committed to the sound discretion of the Court.  See Girl Scouts, 549 F.3d at 1086.  In making a decision in light of all the considerations, the Court properly reaches a conclusion "based on a subjective evaluation of the import of the factors and a personal, intuitive sense about the nature of the case."  Id.; Lawson Products, 782 F.2d at 1436.

### D.   Likelihood of Success on the Merits

The Verified Complaint seeks relief in seven counts for false designations and misleading representations in violation of Lanham Act §43(a), 15 U.S.C. §1125(a), copyright infringement, misappropriation of trade secrets, breach of contract, conversion, unfair competition and declaratory relief.  The record shows that Dion created original and innovative designs, having substantial commercial value, and turned them over to defendants under a promise of payment for all commercial products sold, only to see the agreement repudiated without the provision of any compensation at all and, now, the launch of a new product line by Allwin in the United States based on those designs.  On all counts, Dion has established a likelihood of success on the merits of the asserted claims.

8

False Designations and Misleading Representations. Lanham Act §43(a), 15 U.S.C. §1125(a), establishes a cause of action where, in connection with goods or services in commerce, a person employs a false designation of origin or false or misleading factual representation that is either likely to cause confusion regarding affiliation, origin, sponsorship or approval by another or, in commercial advertising, misrepresents the nature, qualities or origin of the products. This section created a federal statutory tort that reflected the prior federal common law on unfair competition. See 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 747 F.2d 81, 90-93 & n.15 (2d Cir. 1984), cert. denied, 470 U.S. 1052 (1985). The underlying purpose of Section 43(a) "is to protect both consumers and competitors from a wide variety of misrepresentations of products and service." Id. at 91 n.13. Relief is available under Section 43(a) for a range of deceptive practices, including trademark abuse, "passing off," and false advertising. Id. at 90-93.

By misappropriating the designs created by Dion and marketing the new LS2 line of products as though Allwin and MHR validly owned or licensed those designs, Allwin has falsely represented the source and origin of its products and falsely held itself out as being authorized and entitled to market those designs. False and misleading representations regarding intellectual property rights and product exclusivity are actionable under Lanham Act §43(a). See, e.g., Upjohn Co. v. Riahom Corp., 641 F. Supp. 1209, 1223 (D. Del. 1986); In re Uranium Antitrust Litigation, 473 F. Supp. 393, 408 (N.D. Ill. 1979). The deceptive impact here is accentuated by Allwin's emphasis in its website promotion that the products were "created in China, designed in Europe." See Verified Complaint ¶¶34, 50 & Ex. D. Insofar as MHR operates a "tech design team" facility in Spain (see Ex. D, "About Us"), the "designed in Europe" assertion fosters a false impression that the designs are

9

proprietary to MHR, when in fact the designs were created by Dion in Quebec and are now being pirated by the defendants.

In the seminal case of International News Service v. Associated Press, 248 U.S. 215, 237-42 (1918), the Supreme Court held the utilization of one news service's releases by a rival service constituted unfair competition, because the first service invested resources in gathering and investigating the information and the second was "endeavoring to reap where it has not sown" and "appropriating to itself the harvest of those who have sown." Id. at 239-40. The Court stated that the system of misappropriating the other service's news releases and presenting them as commercial products to clients "amounts to a false representation to them and to their newspaper readers that the news transmitted is the result of defendant's own investigation in the field." Id. at 242. See also 20th Century Wear, 747 F.2d at 92 n.15 (under Section 43(a), pre-Lanham Act cases applying federal law of unfair competition are persuasive if not controlling).

Here, Dion invested considerable time, effort and creative imagination to develop a set of designs having substantial commercial value, and now the defendants have taken those designs without any compensation at all to Dion and are presenting them to the world as their own. As in International News Service, Allwin and its affiliates seek to reap where they have not sown, and are falsely representing that the new LS2 line of products are based on their own designs. There is a strong likelihood, accordingly, that Dion will prevail in demonstrating that Allwin and its affiliates have acted in violation of Lanham Act §43(a).

Copyright Infringement. The designs created by Dion are original works having substantial aesthetic and artistic merit. See Verified Complaint ¶¶16, 30, 56. The designs

derive commercial value from their distinctive appearance and innovative style. Id. Mr. Dion is a citizen of and resides in Canada, Dion Designs is a Canadian company, the designs were created in Quebec, and Canada is a signatory to the Berne Convention. The designs, therefore, are subject to protection under the United States copyright laws. See 17 U.S.C. §104.

Unquestionably, the new line of LS2 products that Allwin seeks to market in the United States are substantially similar to, and in fact were directly derived from, the original designs created by Dion. See Verified Complaint ¶¶36-39, 60; compare Exs. B, C with Exs. E, F, G. The record establishes that the designs were delivered by Dion to MHR and Mr. Liao by or around March 2010, and the new line of LS2 products incorporating those designs in their entirety or in material part were introduced in Europe in late 2010 and are now being launched by Allwin in the United States. Id.; see also ¶¶27-30. Unquestionably, the new line of LS2 helmets were directly based on the designs provided by Dion, and not only are substantially similar but in fact were deliberately copied. There is a strong likelihood, consequently, that Dion will prevail in establishing infringement of the copyrighted designs. See 17 U.S.C. §501 et seq.; Twin Peaks Productions, Inc. v. Publications International, Ltd., 996 F.2d 1366, 1372 (2d Cir. 1993) (infringement may be established by direct evidence of copying or by evidence of access and substantial similarity).

Notably, the designs are Canadian works eligible for protection under United States copyright law pursuant to 17 U.S.C. §104, implementing the provisions of the Berne Convention. Registration of a copyright is required as a prerequisite for relief for infringement only if the case involves a "United States work." See 17 U.S.C. §411(a).

11

Completion of the registration process, accordingly, is not required to establish eligibility for relief. Nevertheless, Dion has duly filed applications for registration and those applications are now pending before the United States Copyright Office. See Verified Complaint ¶59. Rights under the copyright laws arise from the act of creation and at the time the work is completed. See 17 U.S.C. §302(a). There is every reason to expect the registration process will be completed well before trial. In any event, therefore, the current registration status does not diminish the likelihood of success.

In addition, the designs cannot be characterized as "works for hire," insofar as they were created independently by Dion in Quebec using his own materials and equipment and without direction and supervision by MHR. See Verified Complaint ¶¶23, 28. See also Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739-53 (1989) (finding sculptor was independent contractor and commissioned work was not work-for-hire); 17 U.S.C. §101 (definition of "work made for hire"). The designs may be regarded as "commissioned" works under the statutory definition, but there is no written contract vesting any copyright in MHR rather than Dion as required by statute. See Verified Complaint Ex. A (agreement silent as to copyright in designs).

At most, the designs were delivered under an implied license, premised on the course of dealings by which Dion was paid commissions based on sales of products utilizing the designs. See Verified Complaint ¶¶18-20, 24-26 & Ex. A. However, Mr. Liao terminated that business arrangement shortly after the new designs in question were delivered, before any commercial products based on those designs were sold. Id. ¶¶32-33, 43. Although Mr. Liao initially acknowledged an ongoing obligation to pay commissions and sought to renegotiate the rate, the payments were soon curtailed altogether and Dion

received nothing for the new designs. Id. Payment is undeniably a material element of any license, yet here the refusal to pay the first nickel for the new designs amounts to a complete failure of consideration and a repudiation of the agreement between the parties. Contrast I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996) (holding implied license for use of architectural drawings was not abrogated where architect was substantially paid but did not receive all of the contract sum). Allwin cannot claim the benefit of any implied license where no payment at all has been made for the designs.

Misappropriation of Trade Secrets. Dion maintained confidentiality when creating the designs, and provided them to MHR and Mr. Liao only under an agreement that was then repudiated and terminated without any payment to Dion for those designs. See Verified Complaint ¶66. The designs have substantial commercial value, as evidenced by defendants' launching of a business enterprise in the United States based on products utilizing those designs. Id. ¶65. By acquiring copies of the design materials and then refusing to pay for them, and proceeding to use them anyway in producing a new line of commercial products, defendants misappropriated Dion's valuable trade secrets.

Because the primary event in Allwin's launching of the new product line is occurring in Indianapolis, Indiana law is applicable to the trade secrets claim. See Jean v. Dugan, 20 F.3d 255, 261 (7th Cir. 1994) (noting Indiana traditionally applied *lex loci delicti* rule, as modified by a "most significant contacts" test where "the place of the tort" will often have the most contacts); Simon v. United States, 805 N.E.2d 798, 805 (Ind. 2004) (presumption is that law of the "place of the wrong" applies). The products embodying the misappropriated trade secrets will be, under Allwin's plan, publicly displayed and exhibited for commercial purposes before a national audience of motorcycle dealers at the

13

Dealer Expo in Indianapolis. The remedies available under the Indiana trade secrets statute, accordingly, are applicable. See Ind. Code §24-2-3-1 et seq.

Absent the misappropriation, Dion would have the opportunity to realize the value of the designs by marketing helmets based on those designs or entering into arrangements with third parties to do so. Once Allwin has introduced its new LS2 product line in the United States, however, the value of the designs would drop substantially or be eliminated entirely. The planned presentation at the Indianapolis show of products embodying Dion's proprietary and confidential designs, accordingly, would inflict extensive injury to the value of the trade secrets. There is a substantial likelihood that Dion will prevail at trial in establishing misappropriation.

Common Law Torts. Because the primary act by Allwin consummating the common law violations is occurring in Indianapolis, the additional tort counts for breach of contract, conversion and unfair competition are appropriately governed by Indiana law. See Jean, 20 F.3d at 261; Simon, 805 N.E.2d at 805. There are strong grounds for the contract claim, insofar as Allwin is now seeking to commercialize in the United States the designs provided by Dion under an agreement that defendants failed to honor, by refusing to pay anything for the designs. See Smither v. Asset Acceptance, LLC, 993 N.E.2d 1153, 1157 (Ind. App. 2010) (elements of claim are existence of contract, breach by defendant, and resulting damage to the plaintiff).

In addition, unlawful conversion occurred when defendants exerted unauthorized control over Dion's property after the design materials were delivered under a subsequently repudiated agreement, and now are entering the United States market at the Indianapolis event with products derived from those retained designs. See Patriot Homes,

14

Inc. v. Forest River Housing, Inc., 489 F. Supp.2d 865, 871 (N.D. Ind. 2007) (holding
designer's conversion claim not preempted by statute); Ind. Code §34-24-3-1 (providing for
recovery of treble damages and attorney fees in actions by victims of crimes against
property).

Indiana, finally, recognizes broad bases for recovery for unfair competition. See
CDW LLC v. Netech Corp., 722 F. Supp.2d 1052, 1063-64 (S.D. Ind. 2010); Keaton and
Keaton v. Keaton, 842 N.E.2d 816, 820 (Ind. 2006); Bartholomew County Beverage Co. v.
Barco Beverage Corp., 524 N.E.2d 353, 358 (Ind. App. 1988). The cause of action is
applicable here, where defendants, through Allwin, are launching a competitive enterprise
in the United States predicated on product designs misappropriated from Dion, and
thereby substantially undermining Dion's ability to commercialize and compete with his
own designs. See 20th Century Wear, 747 F.2d at 92-93 & n.15 (discussing compatibility of
state law unfair competition with Lanham Act §43(a)). Even if Allwin were able to raise
some technical defense to one or more of the other counts, therefore, relief would still be
appropriate on the unfair competition claim.

## E.    Irreparable Harm and Inadequate Remedy at Law

The violation of Dion's intellectual property rights and proprietary interests in the
unique designs establishes irreparable harm for purposes of injunctive relief. See Ty, 237
F.3d at 902-03 (affirming grant of preliminary injunction in trademark case; "These type
of injuries are presumed to be irreparable"). The Lanham Act, the Copyright Act and
Indiana's Trade Secrets Act all provide explicit statutory authorization for the issuance of
injunctions to enforce the rights established under those provisions. See 15 U.S.C.
§1116(a); 17 U.S.C. §502(a); Ind. Code §24-2-3-3. The harm that would be inflicted on

Dion by Allwin's planned introduction of the new LS2 product line based on the pirated designs, furthermore, would be a blow not only to the economic value of Dion's potential business prospects, but further to his reputation and standing in the industry and the goodwill he has cultivated as a designer. See Verified Complaint ¶¶15, 17. Damage to such intangible interests is deemed irreparable and hence subject to equitable protection. See Girl Scouts, 549 F.3d at 1090.

Dion's potential recovery of monetary damages after the fact, moreover, does not provide an adequate remedy precluding injunctive relief. The misappropriated designs are unique, and the opportunity to introduce products based on those designs in the United States market will not occur a second time. Tracing precise economic consequences of injuries to unique intellectual property rights and loss of singular market opportunities, and quantifying the resulting harm to intangible interests such as business reputation and goodwill, is virtually impossible. See Ty, 237 F.3d at 902. To be inadequate for preliminary injunction purposes, a damages remedy need not be wholly ineffectual, but only seriously deficient in comparison to equitable relief. See Girl Scouts, 549 F.3d at 1095. Here, the grant of a preliminary injunction would prevent substantial harm to Dion that a later award of money damages absent an injunction would not fully and effectively remedy.

Notably, Allwin is a start-up company, incorporated in 2010 for the express purpose of launching the new line of LS2 products in the United States market. See Verified Complaint ¶34. The Dealer Expo in Indianapolis will be Allwin's first major exhibition in the United States, introducing its new product line to the dealers it seeks to persuade to carry them. In the event of protracted litigation ending in final judgment for Dion, Allwin's Chinese owners and affiliates could decide to dissolve that vehicle, perhaps in

16

favor of another, and Dion's ability to collect and enforce any judgment against Allwin would be compromised. The other defendants, moreover, the MHR family of companies and Mr. Liao, are Chinese entities in a position to resist efforts to collect on and enforce the judgment of a United States Court, again leaving Dion in a position of being vindicated on paper but frustrated in remedy. The uncertain prospect of recovering an award of damages after trial, accordingly, is not an adequate alternative to an injunction preventing the harm from occurring in the first instance.

## F.    **Balance of Harms and Public Interest**

Under the "sliding scale" applied in balancing the relative harms, the strength of Dion's claims and the substantial likelihood that Dion will prevail at trial supports the issuance of a preliminary injunction even if there were not a marked disparity in irreparable consequences to the respective parties. See Girl Scouts, 549 F.3d at 1100. The irreparable harm to Dion absent a preliminary injunction, however, would be substantial and extensive, inflicting ruin on the value of unique and proprietary creations, devastating the fruits of inspired design work, destroying an irretrievable business opportunity, and degrading Dion's reputation and goodwill in the industry. This is a case, therefore, in which a strong likelihood of success on the merits is combined with a substantial showing of irreparable harm unless a preliminary injunction is issued.

To Allwin and its Chinese affiliates, by contrast, the requested injunction represents at worst a modest delay in entering a market in which, to date, the LS2 product line has not yet been introduced. The preliminary injunction, in other words, would not represent a significant disruption in any established business, and would not necessitate any drastic restructuring of longstanding business relationships and arrangements, but rather would

17

only require Allwin to postpone its proposed entry to the United States market until the rights in the new LS2 product line can be determined in a orderly fashion.

Absent entry of a preliminary injunction, the defendants would have the luxury of time to penetrate the market using the misappropriated designs, as well as the benefit of vastly superior resources to bring to bear in the litigation. The Chinese defendants, secure in the continued ability to flood the United States market with the new LS2 products and to fill the shelves of the dealers they seek to solicit at the upcoming Dealer Expo, will have every incentive in that event to delay and resist adjudication of the claims raised by Dion as long as possible, while employing every device at their disposal to maximize the burdens of litigation on their adversary. Dion, meanwhile, would face the daunting task of turning back a massive enterprise half a world away, after it has already been set loose to exploit a new market, all the while watching the value of unique designs disappear and the chances of ever securing a fully compensatory recovery diminish with each passing day.

The challenges associated with enforcing intellectual property rights in the face of widespread infringement and misappropriation in foreign countries is a matter of public concern. To Mr. Liao and MHR, it may have seemed all too easy to renege on the license arrangement and refuse to pay anything for the new designs, once the materials were delivered by Dion. The obstacles to enforcement of Dion's rights, as against the production of pirated goods in China, may well have seemed sufficiently high to convey a sense of security when taking Dion's work and treating it as their own without paying anything for it. The event at issue here, however, is occurring in Indianapolis, and the market defendants now wish to penetrate is the United States. This Court has all necessary authority to prohibit Allwin and its affiliates from making the Indianapolis show their

18

vehicle for launching a line of pirated products.  The public interest, accordingly, weighs heavily in favor of granting the preliminary injunction.

### G.     Bond Requirement

Pursuant to Fed. R. Civ. P. 65(c), a preliminary injunction is properly secured with a bond "in an amount that the court considers proper."  The purpose of the bond is to provide security for the costs and damages that may be sustained in the event the party is ultimately determined to have been wrongfully enjoined. Id.  Like the determination to issue a preliminary injunction, the setting of an appropriate bond is entrusted to the sound discretion of the Court. See Scherr v. Volpe, 466 F.2d 1027, 1035 (7th Cir. 1972); CDW, 722 F. Supp.2d at 1066.

In determining an appropriate bond amount, the Court may properly weigh the assessment of the likelihood of success, so as not to burden a party with excessive expense to secure preliminary injunctive relief that the Court is highly likely to make permanent at the conclusion of the litigation. See Scherr, 466 F.2d at 1035; CDW, 722 F. Supp.2d at 1066.  The strength of Dion's claims, therefore, and the probability of confirming the right to relief at trial, caution against setting the bond requirement at a prohibitively high level.

Mr. Dion is an individual of modest means, and Dion Designs is a small operation. In contrast, as touted by Allwin on its website, MHR is "one of the world's largest manufacturers." See Verified Complaint Ex. D.  A bond requirement that would provide absolute security to Allwin against every kind of financial consequence it could postulate as possibly arising from the requested injunction could well take the relief beyond Dion's capability to make the posting, and thereby serve as an expedient mechanism for Allwin to avoid being enjoined at all.  Where, however, "a bond that would give the opposing party

absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay," as here, the Court properly "balances (often implicitly) the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." Habitat Education Center v. United States Forest Service, 607 F.3d 453, 458 (7th Cir. 2010).

Dion respectfully submits that an appropriate bond here would be no more than $10,000. Compare Habitat Education Center, 607 F.3d at 457-60 (affirming $10,000 bond for non-profit plaintiff). Such a bond would be scaled in proportion to the level of disruption and expense Allwin may reasonably expect to incur in withdrawing from the Dealer Expo, or in otherwise conforming its presentation there to the terms of a preliminary injunction. In order to minimize any further potential hardship that injunctive relief could occasion, Dion is also willing to proceed as expeditiously to a final determination of the merits as Allwin and the other defendants may consider agreeable, so as to leave the preliminary injunction in place for as short a period of time as the dictates of orderly adjudication can accommodate.

In the alternative, and only in the event the Court deems a bond greater than Dion's capability to post is necessary to provide adequate security for a preliminary injunction, Dion would also be willing to consolidate the preliminary injunction hearing with trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). By necessity, a consolidated hearing and trial would address only the claims against Allwin, and not the other defendants. Under such an alternative, if the Court concludes in entering final judgment against Allwin that a permanent injunction should be issued, the bond requirement under Rule 65(c) would no longer apply. See Ty, Inc. v. Publications International Ltd., 292 F.3d 512, 516 (7th Cir.

2002) (noting an injunction bond "is required only for a temporary restraining order or a preliminary injunction, Fed.R.Civ.P. 65(c), not for a permanent injunction").

### H.    Requested Terms of Preliminary Injunction

A preliminary injunction must state with reasonable particularity the activities being restrained. See Fed. R. Civ. P. 65(d)(1). In this case, Dion seeks a preliminary injunction directed specifically to Allwin, which is the duly served domestic defendant and the named exhibitor that has reserved a booth at the upcoming Dealer Expo for purposes of marketing the products at issue. The specific models that Allwin should be enjoined from displaying and promoting at the Indianapolis show are the FF385 and FF358, both of which are based almost entirely on designs provided by Dion for which no compensation was paid, and the FF386, OF560 and OF569, which materially feature recognizable elements of the new shield retention system design created by Dion.

In addition to prohibiting Allwin from displaying, selling, marketing, promoting, offering to sell, exhibiting or otherwise commercially presenting the FF385, FF358, FF386, OF560 and OF569 models at the Dealer Expo in Indianapolis on February 18-20, 2011, the preliminary injunction should also prohibit Allwin from advertising those same models on its website or through other outlets of communication. In that way, Allwin will be required to refrain from introducing the new line of LS2 products in the United States market, pending a full and final determination on the merits of the claims asserted by Dion.

### I.    Conclusion

Dion respectfully submits that the predicates for issuance of a preliminary injunction are fully satisfied and that such relief would be appropriate and just in the circumstances. Allwin, accordingly should be enjoined from displaying, selling, marketing,

21

promoting, offering to sell, exhibiting or otherwise commercially presenting the FF385,

FF358, FF386, OF560 and OF569 models of LS2 motorcycle helmets at the Dealer Expo in

Indianapolis on February 18-20, 2011, and from advertising those models in its website or

otherwise, pending trial and final judgment in this case.

Respectfully submitted,

LEWIS & KAPPES

By: _____
Todd A. Richardson (16620-49)

Counsel for Stephane Dion and Dion Designs

LEWIS & KAPPES
One American Square, Suite 2500
Indianapolis, Indiana 46282
Telephone:    (317) 639-1210
Fax:             (317) 639-4882
E-mail:          TRichardson@Lewis-Kappes.com